UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NATIONAL ASSOCIATION OF REALTORS,<br><br>Plaintiff,<br><br>v.<br><br>CHAMPIONS REAL ESTATE SERVICES INC., et al.,<br><br>Defendants. | CASE NO. C10-0049JLR<br><br>ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT |

This matter comes before the court on Plaintiff National Association of Realtors' ("NAR") motion for partial summary judgment (Dkt. # 29) against Defendants Champions Real Estate Services, Inc. ("Champions"), Patricia Lord, and Richard Lord (collectively, "Defendants"). NAR's complaint alleges violations of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), unfair competition under the Washington State Consumer Protection Act, RCW 19.86.020, and common law trademark infringement. (*See generally* Compl. (Dkt. # 1).) NAR seeks summary judgment as to its federal trademark

ORDER- 1

infringement and unfair competition claims under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), and asks the court to permanently enjoin Defendants from using NAR's trademarks. (Mot. (Dkt. # 29) at 21.) Having considered the briefing of the parties, the record, and the relevant law, and having heard oral argument, the court GRANTS summary judgment against Champions and Mrs. Lord and DENIES summary judgment against Mr. Lord.

I. BACKGROUND

NAR, a trade association of real estate professionals, has approximately 1,000,000 members throughout the United States. (Declaration of Michael Thiel (Dkt. # 31) ¶ 3.) For the past 60 years, NAR has owned federally-registered trademarks in the words REALTOR® (U.S. Registration No. 519,789) and REALTORS® (U.S. Registration No. 515,200) (collectively, "the Marks"). (Declaration of Neil Dial (Dkt. # 30) Exs. 1, 2.) The services covered by the Marks are defined as "brokerage of real estate, industrial brokerage, farm brokerage, mortgage brokerage, in the appraisal of real estate, management of real estate, in the building of structures on real estate, in the subdivision of real estate properties, and in community planning for the development of raw land and slum clearance areas." (*Id.*) The Marks are "collective marks," *see* 15 U.S.C. § 1127, which are used by NAR's members to identify their membership in the organization (Compl. ¶ 17). Only NAR's active, dues-paying members are permitted to use the Marks. (Thiel Decl. ¶ 7.) Furthermore, for a real estate office to be a "REALTOR® office," all real estate brokers in the office must be active, dues-paying members. (*Id.* ¶ 8.)

1 | Champions has several real estate offices in western Washington, including in
2 | Lynnwood, Edmonds, and Anacortes. (Dial Decl. Ex. 9.) Mrs. Lord is a licensed real
3 | estate managing broker and owns and operates Champions. (Dial Decl. Ex. 24 ¶ 2.) Mr.
4 | Lord is a licensed real estate broker, owner of Champions, and is responsible for
5 | Champions' finances. (*Id.* ¶ 5; Pretrial Order (Dkt. # 55) at 14.)

6 | Before 2009, Champions' offices in Lynnwood, Edmonds, and Anacortes were all
7 | REALTOR® offices, and its brokers were all members of NAR. (Dial Decl. Ex. 25 ¶¶ 8,
8 | 19.) In late 2008, however, Champions' brokers in the Lynnwood and Edmonds offices
9 | voted not to renew their membership in NAR for 2009. (*See* Declaration of Michael
10 | Daudt (Dkt. # 35) Ex. E.) On December 30, 2008, Mrs. Lord sent an e-mail to
11 | Champions' staff instructing them to "go through what ever things you prepare for the
12 | office like ads, cma pages, fax cover sheets, letter head, business cards and take off the
13 | Realtor logos." (*Id.* Ex. D.) On January 1, 2009, Mrs. Lord sent a second e-mail to
14 | Champions' staff requesting that they "discontinue the use of the word 'Realtor'" and
15 | remove the word "from business cards, letter head, web sites, CMA's, signatures, fax
16 | cover sheets, etc." (*Id.* Ex. E.)

17 | Beginning in April 2009, NAR discovered that some of Champions' brokers in the
18 | Lynnwood and Edmonds offices were continuing to identify themselves as "Realtors" or
19 | "realtors" on their professional websites and in their marketing materials.[1] (Dial Decl.

---

[1] There is no evidence, however, that either Mrs. Lord or Mr. Lord ever referred to themselves as "Realtors" or "realtors," or otherwise used the Marks.

Exs. 10-22.) Defendants do not dispute that the brokers' use of "Realtor" and "realtor" was, in fact, use of the Marks. (*See* Resp. at 3-8 (referring repeatedly to the brokers' use of "the marks"); Dial Decl. Ex. 24 ¶ 23.)

NAR responded to the brokers' use of the Marks by sending cease and desist notices. (*See* Dial Decl. Exs. 10-22.) On April 8, 2009 and June 8, 2009, NAR sent cease and desist notices to broker Peggy Johnson. (*Id.* Ex. 10.) In June 2009, NAR sent cease and desist notices to brokers Bill Bickel, Kathy Proctor, Jeffrey Strickland, and Mark Davenhall. (*Id.* Exs. 13, 16, 18, 21.) On June 8, 2009, June 23, 2009, and July 13, 2009, NAR sent cease and desist notices to broker James Robeson. (*Id.* Ex. 11.) On June 17, 2009 and July 13, 2009, NAR sent cease and desist notices to brokers Dan Robinson, Dirk Jansen, and Wendy Heiliger. (*Id.* Exs. 12, 14, 19.) On June 24, 2009 and July 13, 2009, NAR sent cease and desist notices to brokers David Sundquist, Norm and Judy Chapman, and Jacqueline Cliff. (*Id.* Exs. 15, 17, 20.) Only the June 17 cease and desist notice to Wendy Weilier and the July 13 cease and desist notices to Mr. Jansen and the Chapmans were copied to Mrs. Lord. (*Id.* Exs. 12, 17, 19.)

Mrs. Lord's response to these notices was mixed. At the time, she believed that the Marks prevented non-members from using "REALTOR®" or "REALTORS®" but did not prohibit the use of "Realtor" or "realtor."[2] (*See* Lord Dep. at 43-49, Daudt Decl. Ex. A.) She shared this opinion with Champions' brokers in a June 18, 2009 e-mail, which stated in part:

---

[2] Defendants do not maintain this position in their response brief. (*See generally* Resp.)

ORDER- 4

> <u>Any</u> real estate agent <u>may use</u> and be called "Realtor" <u>whether or not</u> you are a member of the Board of Realtors. <u>All</u> real estate agents are Realtors! . . . The United States Supreme Court rules that no person can own any <u>one</u> <u>word</u>. <u>You</u> may use it all day long . . . in ads, e-mail, web site, etc!

(Dial Decl. Ex. 23 (emphasis in original).) Mrs. Lord, however, testified that her usual response when she learned that NAR had mailed a cease and desist notice to a broker was to ask the broker to remove the Marks. (*See, e.g.*, Lord Dep. at 41, 69, 75, Daudt Decl. Ex. A; *see also* Cliff Dep. at 21-32, Supplemental Declaration of Neil Dial (Dkt. # 37) ("2d Dial Decl.") Ex. 1.) Mrs. Lord also sent a second e-mail to Champions' brokers on July 18, 2009—after many brokers had received NAR's July 13, 2009 cease and desist notices—instructing them not to use "REALTOR or [sic] it's trademarks, logos or designations." (Daudt Decl. Ex. G.) She further instructed them to contact her if they had questions. (*Id.*)

Most of the brokers removed the Marks immediately or shortly after receiving the cease and desist notices from NAR. Indeed, there is no evidence in the record that Mr. Bickel, Ms. Proctor, Mr. Strickland, or Mr. Davenhall continued to use the Marks after June 2009. (Dial Decl. Exs. 13, 16, 18, 21.) And there is no evidence that Mr. Robeson, Mr. Robinson, Mr. Sundquist, Ms. Heiliger, or Ms. Cliff used the Marks after July 2009. (*Id.* Exs. 11, 14, 15, 18, 20.) Several brokers, however, continued using the Marks into the fall and winter of 2009. In October 2009, NAR discovered that brokers Theresa Shea and Josef Niklas used the Marks in a brochure. (*Id.* Ex. 22.) And as of December 2009, Mr. Jansen and the Chapmans had not yet removed the Marks from their websites. (*Id.* Exs. 12, 17.) Ms. Johnson also testified at her deposition that she did not remove the

Marks until the initiation of the instant lawsuit. (Johnson Dep. at 24-25, 2d Dial Decl. Ex. 2.) There is no evidence in the record that any of Champions' brokers are currently using the Marks.

On January 8, 2010, NAR filed a complaint alleging violations of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); unfair competition under the Washington State Consumer Protection Act, RCW 19.86.020; and common law trademark infringement. (Compl.) On June 10, 2011, NAR filed its motion for partial summary judgment on the Lanham Act claims. (Mot. (Dkt. # 29).) On June 27, 2011, Defendants responded (Dkt. # 34), and on July 1, 2011, NAR filed its reply (Dkt. # 36). The court heard oral argument on August 12, 2011, and this order follows.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits, when viewed in the light most favorable to the nonmoving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets its burden, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Cline v.*

*Indus. Maint. Eng'g. & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen*, 477 F.3d at 658. Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B. Defendants' Liability for the Acts of Champions' Brokers**

NAR does not claim that Defendants directly infringed on its rights. (*See generally* Mot.) Instead, it argues that Defendants are liable for the actions of the brokers who used the Marks in violation of the Lanham Act. (*See generally* Mot.) NAR asserts three bases for this liability: (1) Washington's Real Estate Brokers and Sales Persons Act ("REBSPA"), RCW 18.85.010, *et seq.* (2009); (2) contributory trademark infringement; and (3) common law vicarious liability. (Mot. at 18-21.)

As an initial matter, NAR presents no evidence that could establish Mr. Lord's liability under any of these theories. Indeed, the record shows only that Mr. Lord is an owner of Champions, not that he is a managing broker. As such, he cannot be held secondarily liable for the acts of the brokers. Because there is no evidence of direct or secondary liability as to Mr. Lord, the court denies NAR's motion for summary judgment as to this defendant.

NAR first argues that Champions and Mrs. Lord are legally responsible for the allegedly infringing acts of the brokers under REBSPA. (Mot. at 18.) Defendants did not rebut this argument in their response brief. (*See generally* Resp.) The court concludes

that REBSPA establishes a relationship between Champions and Mrs. Lord, on the one hand, and Champions' brokers, on the other, such that Champions and Mrs. Lord can be held secondarily liable, as a matter of law, for the acts of the brokers that are within the scope of REBSPA. Accordingly, the court does not address NAR's additional theories of liability.

REBSPA provides in relevant part:

> Responsibility for any salesperson, associate broker or branch manager in conduct covered by this chapter shall rest with the broker to which such licensees shall be licensed. In addition to the broker, a branch manager shall bear responsibility for salespersons and associate brokers operating under the branch manager at a branch office.

RCW 18.85.155 (2009) (recodified as RCW 18.85.201 and amended July 1, 2010).[3] This provision establishes that managing brokers, such as Mrs. Lord, are responsible for the conduct of their subordinates, so long as the subordinate's behavior is regulated by REBSPA. *See Wilkinson v. Smith*, 639 P.2d 768, 771 (Wash. Ct. App. 1982) (holding that REBSPA established a real estate company's secondary liability under the Washington State Consumer Protection Act for the acts of its broker).[4] In this case,

---

[3] The court cites to the 2009 version of REBSPA because the allegedly infringing behavior occurred while these laws were in effect. As a general rule, courts do not apply "statutes affecting substantive rights, liabilities, or duties" retroactively. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 835 (9th Cir. 1997) (quoting *Langraf v. USI Film Products*, 511 U.S. 244, 278 (1994)). Here, the amendments to REBSPA were not effective until July 1, 2010, well after this lawsuit was filed, thus there is no reason to apply them retroactively. In any event, the new law did not substantively change RCW 18.85.155 (2009). *See* RCW 18.85.201 (2011).

[4] While REBSPA does not create a private cause of action, *Woodhouse v. Re/Max Northwest Realtors*, 878 P.2d 464, 466 (Wash. Ct. App. 1994), it can be used to establish

Champions' brokers allegedly misrepresented their membership in NAR when they used the Marks. (Compl. ¶¶ 21, 28.) Because REBSPA regulates misrepresenting membership in a state or national real estate association, RCW 18.85.230(14) (2009) (recodified as RCW 18.85.361 and amended July 1, 2010), Champions and Mrs. Lord can be held secondarily liable for this behavior, *see* RCW 18.85.155 (2009); *Wilkinson*, 639 P.2d at 771.

At oral argument, Defendants' counsel asserted that questions of fact preclude summary judgment on this issue. His argument was based on the section of REBSPA that allows the Director of the Washington State Department of Licensing to discipline a managing broker for failing to exercise adequate supervision. *See* RCW 18.85.230(22) (2009) (recodified as RCW 18.85.361 and amended July 1, 2010). A managing broker's supervision is adequate if it complies with the requirements of WAC 308-124D-061(2) (2009) (repealed July 1, 2010). Specifically, Defendants' counsel argued that there were questions of fact as to whether Mrs. Lord sufficiently supervised the brokers. But the issue here is not whether Mrs. Lord violated REBSPA. The issue is whether REBSPA creates a relationship between Mrs. Lord and Champions' brokers that could subject her to secondary liability under the Lanham Act. That question is answered by RCW 18.85.155 (2009), which plainly states that "[r]esponsibility for any salesperson, associate broker, or branch manager in conduct covered by this chapter shall rest with the broker to which such licensees shall be licensed." For these reasons, the court finds that there is no

---

responsibility on the part of managing brokers and real estate companies for the acts of their subordinates that fall within the scope of the statute, *see Wilkinson*, 639 P.2d at 771.

material issue of fact, and, as a matter of law, REBSPA creates secondary liability for Champions and Mrs. Lord for the allegedly infringing acts of the brokers.

**C. Lanham Act Violations Under 15 U.S.C. §§ 1114 and 1125(a)**

NAR claims that Champions and Mrs. Lord[5] are liable for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). Because analysis of these two provisions is identical, the court will refer to the claims collectively as "infringement." *See Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999). To prevail on an infringement claim, a trademark owner[6] must prove that the alleged infringer used the mark at issue in commerce and in connection with the sale, distribution, or advertising of goods or services in such a way that the use "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114; *see also* 15 U.S.C. § 1125(a). Infringement disputes are "intensely factual in nature," and therefore summary judgments are generally disfavored. *Interstellar Starship Serv., Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999). Where summary judgment is appropriate, however, injunctive relief is the remedy of choice. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988). Broad injunctions are especially appropriate in cases where the infringing use is for a similar service. *Id.* at 1181.

---

[5] NAR also argues that Mr. Lord is liable under the Lanham Act, but there is no evidence to support this. (*See supra* at 7.)

[6] Here, there is no dispute that NAR owns the Marks, which are federally registered. (Mot. at 13; *see* Dial Decl., Ex. 24 ¶ 23.) This "constitutes prima facie evidence of the validity of the registered mark and of [NAR's] exclusive right to use the mark on the goods and services specified in the registration." *Brookfield*, 174 F.3d at 1047.

ORDER- 10

At the outset, the court notes that Defendants do not dispute that the brokers' use of "Realtor" and "realtor" on their websites and in their marketing materials constitutes use of the Marks. (*See* Resp. at 3-8.) Nevertheless, to prevail on summary judgment, NAR must establish that this use created a likelihood of confusion as a matter of law and that there is no material issue of fact. To prove a likelihood of confusion, NAR must show that a "reasonably prudent consumer" in the marketplace is likely to be confused as to the origin of the service bearing these words. *See Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)). This determination involves consideration of the "*Sleekcraft* factors": (1) strength of the mark; (2) proximity or relatedness of the goods or services; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion. *Id.* The factors should not be rigidly weighed and are instead "intended to guide the court in assessing the basic question of likelihood of confusion." *Id.* (quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992)). Indeed, "[s]ome *Sleekcraft* factors 'are much more important than others, and the relative importance of each individual factor will be case specific.'" *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005) (quoting *Brookfield*, 174 F.3d at 1054). The court, therefore, addresses the factors in the order of their importance to this case and, after weighing the factors, concludes that the brokers' use of the Marks on their websites and in their marketing materials creates a likelihood of confusion.

### 1. Similarity of Sight, Sound and Meaning

"The similarity of marks 'has always been considered a critical question in the likelihood-of-confusion analysis.'" *M2 Software*, 421 F.3d at 1082 (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)); *see also Brookfield*, 174 F.3d at 1054. "[T]he more similar the marks [are] in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Brookfield*, 174 F.3d at 1054. Here, there is no dispute the brokers used the Marks. (*See* Resp. at 3-8; Dial Decl. Ex. 24 ¶ 23.) This creates a very strong likelihood that a reasonably prudent consumer would believe that the brokers who identified themselves as "Realtors" or "realtors" were members of NAR. *See Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.*, 143 F.3d 800, 804 (3d Cir. 1998) ("This court has held that where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable."); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (holding that use of the exact mark created a high likelihood of confusion).

### 2. Proximity or Relatedness of the Services

Next, the court considers the relatedness of the services. Related services are more likely than unrelated services to confuse the public as to an individual's affiliation. *Brookfield*, 174 F.3d at 1055. Here, NAR members and Champions' brokers are both in the real estate business, which creates a strong likelihood of confusion.

### 3. Strength of the Mark

"Trademarks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful. A generic mark is the least distinctive, and an arbitrary or fanciful mark is the

most distinctive." *M2 Software*, 421 F.3d at 1080 (internal citation omitted). A mark's strength is determined largely by its distinctiveness, but a mark that would otherwise be weak "may be strengthened by extensive advertising, length of time in business, [and] public recognition . . . ." *Century 21*, 846 F.2d at 1179. In this case, the undisputed evidence shows that the Marks have been registered for over 60 years. (Dial Decl. Exs. 1, 2.) The Marks are used by approximately 1,000,000 individuals in the real estate business in 1,400 local and state associations throughout the United States. (Thiel Decl. ¶ 3.) NAR also expends nearly $30 million per year in advertising to inform consumers as to the advantages of working with a licensed real estate agent who is a NAR member (and thus a REALTOR®). (Thiel Decl. ¶¶ 5-6.) This evidence establishes that the Marks are strong. *See Century 21*, 846 F.2d at 1179 (holding that "Century 21" mark is strong because the company spent several million dollars in advertising services in connection with the mark).

**4. Evidence of Actual Confusion**

Evidence that misuse of a mark has led to actual confusion as to the origin of the goods or services weighs in favor of finding trademark infringement. *M2 Software*, 421 F.3d at 1082. Such evidence, however, is not necessary for the court to find a likelihood of confusion. *Goto.com, Inc.*, 202 F.3d at 1208. Here, NAR argues that the following testimony by Mrs. Lord establishes this factor as a matter of law:

> Q. In what context do you believe it's okay for you, Pat Lord, as a broker, to say I'm also a realtor?
>
> A. Never. I never do that.

| | | |
|---|---|---|
|1| Q. | Okay. So why is that? |
|2| A. | Because if it sounds – if it's going to confuse the public, I stay away from it. . . . |
|3| | |
|4| Q. | Did you review this letter and look into the complaint by Washington Realtors over the use of the web site and the mark REALTOR? |
|5| | |
|6| A. | Yeah, what they're saying here, you know, "you deserve to have a full time, experienced Realtor at your side," you know, I didn't particularly like how she had said that, because I thought that might be confusing to the public, so I asked her to remove it. |
|7| | |

(Mot. at 17-18 (quoting Lord Dep. at 36-37, Dial Decl. Ex. 7).) This testimony, however, merely shows what Mrs. Lord thinks. It does not prove that anyone else was actually confused. As such, this factor does not weigh in NAR's favor.

**5. Remaining *Sleekcraft* Factors**

Neither party addressed the final *Sleekcraft* factors in its briefing, including the marketing channels; types of goods and purchaser care; intent; and likelihood of expansion. Nevertheless, the court concludes that even viewing the evidence in the light most favorable to Champions and Mrs. Lord, there is a very strong likelihood, as a matter of law, that the brokers' use of the Marks on their websites and in their marketing materials would cause confusion. To summarize, Defendants do not dispute that Champions' brokers used the Marks on their websites and in their marketing materials; NAR's members and Champions' brokers are in the same business; and NAR has expended significant resources establishing and protecting the Marks. The court therefore concludes, as a matter of law, that NAR has satisfied its initial burden to demonstrate that the brokers violated the Lanham Act. Champions and Mrs. Lord,

therefore, must identify facts that create a triable issue in order to avoid summary judgment. *See Cline*, 200 F.3d at 1229. They have not met this burden. Therefore, NAR is entitled to summary judgment against Champions and Mrs. Lord on its Lanham Act claims.

**D. Defendants' Arguments**

Defendants make three arguments why summary judgment on NAR's Lanham Act claims is improper: (1) Defendants and Champions' brokers were authorized to use the Marks because they rejoined NAR in 2009; (2) NAR is estopped from claiming that the brokers' use was unauthorized because NAR sent an e-mail to Mrs. Lord accepting Defendants' 2009 renewed membership; and (3) the brokers' use of the Marks was non-infringing under the nominal fair use doctrine. (Resp. at 6-7.)

First, Defendants argue that they rejoined NAR in 2009. (Resp. at 6.) They point to a February 13, 2009 e-mail that Mrs. Lord sent to Nathan Gorton, the executive vice president of the Snohomish County-Camano Association of REALTORS®, in which she told him that Champions' Lynnwood and Edmonds offices had rejoined NAR. (Resp. at 6-7 (citing Daudt Decl. Ex. F).) Mrs. Lord also testified that she believed Champions had rejoined. (*See, e.g.*, Lord Dep. at 10, Daudt Decl. Ex. A.) Mrs. Lord, however, testified further that neither she nor any of the brokers in the Lynnwood or Edmonds offices paid their 2009 membership dues. (*Id.* at 81.) Payment of dues is required to be a member in NAR (Thiel Decl. ¶ 7), a fact Mrs. Lord acknowledged during her deposition (Lord Dep. at 40, Daudt Decl. Ex. A). There is, moreover, no evidence that Mrs. Lord ever instructed the brokers to rejoin in 2009. For these reasons, even viewing the evidence in

the light most favorable to Defendants, the record shows that Defendants and the brokers did not in fact rejoin NAR in 2009.

In their second and third arguments, Defendants assert affirmative defenses. Defendants failed to raise these defenses in a timely-filed responsive pleading as required by Federal Rules of Civil Procedure 8(c) and 12(a). Nevertheless, a defendant may raise an affirmative defense for the first time at the summary judgment stage "if the delay does not prejudice the plaintiff." *Norwood v. Vance*, 591 F.3d 1062, 1075 (9th Cir. 2010) (quoting *Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997)). NAR does not complain that it has been prejudiced by Defendants' tardy assertion of these issues, and it fully addressed each defense in its reply brief. (*See generally* Reply.) The court therefore considers Defendants' affirmative defenses.

Defendants contend that they have an estoppel defense based on the February 13, 2009 e-mail exchange between Mrs. Lord and Mr. Gorton. (Resp. at 6-7.) Mrs. Lord wrote Mr. Gorton to tell him, "We rejoined the Board of Realtors in our RE/MAX Champions of Lynnwood & Edmonds offices today." (Daudt Decl. Ex. F.) Mr. Gorton replied, "We are happy to have you as members. . . . [W]e will adjust our records to reflect that." *Id.* Defendants argue that Mr. Gorton's e-mail "induced" them to continue using the Marks. (Resp. at 7.)

Estoppel involves four elements:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*In re Gebhart*, 621 F.3d 1206, 1212 (9th Cir. 2010) (quoting *Bob's Big Boy Family Rests. v. NLRB*, 625 F.2d 850, 854 (9th Cir. 1980)). Defendants have not presented evidence demonstrating a genuine dispute of material fact as to any of these elements. There is no evidence that Mr. Gorton knew whether or not Defendants had paid their membership dues. There is also no evidence as to Mr. Gorton's intent. With respect to the third element, the record shows that Mrs. Lord knew that membership required payment of annual dues but that she never paid her 2009 dues or instructed the brokers to pay their dues. (Lord Dep. at 40, 81, Daudt Decl. Ex. A.) She was therefore not ignorant of the true facts. Finally, there is no evidence that Defendants relied on Mr. Gorton's e-mail.

Second, Defendants assert without discussion that the brokers' use of the Marks is protected by the nominal fair use doctrine. (Resp. at 7.) This doctrine applies when three elements are satisfied: "First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Publ'g Inc.*, 971 F.2d 302, 308 (9th Cir. 1992); *see also Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010). Defendants cite no evidence in support of this defense, and, in fact, the evidence in the record disproves each element. First, Defendants and Champions' brokers identified themselves as "real estate brokers" rather than as "realtors" after they stopped using the Marks. Second, it was wholly unnecessary

for the brokers to identify themselves using the Marks because they could use the term "real estate broker." Finally, because the Marks are used to identify NAR members, the brokers' use incorrectly implied that they were members. In short, Defendants cannot defeat summary judgment with the nominal fair use doctrine.

**E. Remedies**

Because the court grants partial summary judgment in NAR's favor and against Champions and Mrs. Lord, the court must consider the appropriate remedy. The preferred remedy under the Lanham Act is injunctive relief. *Century 21*, 846 F.2d at 1180. The court directs NAR to submit a supplemental brief, not to exceed eight pages, and a proposed injunction order within seven days of the entry of this Order. Defendants will then have seven days to submit a supplemental response brief, not to exceed eight pages, and a proposed injunction order. NAR will have three days to submit a reply of five pages or less.

The Lanham Act permits the court to award additional remedies, where appropriate. NAR did not address additional remedies in its motion for summary judgment but instead reserved presentation of these issues for trial. The court will therefore assess the propriety of any additional remedy at trial.

### III.  CONCLUSION

For the reasons stated in this order, NAR's motion for partial summary judgment (Dkt. # 29) is GRANTED as to Champions and Mrs. Lord, and DENIED as to Mr. Lord. The court DIRECTS the parties to file supplemental briefs and proposed orders regarding injunctive relief in accordance with the schedule set forth in this Order.

Dated this 22nd day of August, 2011.

*[signature]*

JAMES L. ROBART
United States District Judge